182145 Johnstech International v. JF Microtechnology SDN BHD 182145 Johnstech International v. JF Microtechnology SDN BHD 182145 Johnstech International v. JF Microtechnology The fundamental error of the judgment of infringement in this case is that Johnstech conflated literal infringement with infringement by the doctrine of equivalence in that it argued that making the same structure that constitutes the means for biasing the contact against the housing wall, the elastomer, that that is simultaneously the housing wall itself. In other words, having failed correctly, I think, in a direct literal infringement analysis, that same analysis was used to say it is doctrine of equivalence. So that what we have here is a patent, a very short patent with a very short specification that discloses only the contact with the housing wall that has three elements, a housing wall, a housing, an elastomer, and a contact. Those three elements have been turned into a doctrine of equivalence by turning the elastomer, which was defined as the means for biasing the contact into contact with the housing wall, engagement with the housing wall, into an engagement by equivalence with that same elastomer. Why isn't that a question of fact for a jury? I don't think it is a question of fact, Your Honor. The reason is that, as we have explained in our brief, in our several briefs, that it eliminates, by virtue of turning the elastomer into both the means for biasing the contact into engagement at the housing wall and the equivalent of the housing wall, you are vitiating the need for the required housing. The housing is a separately specified element of claim one and all through the other claims. So it can't be, it seems to me, a question that the jury can say, as a fact, we don't need the housing wall because you have the elastomer. The elastomer was the means for biasing the contact for direct engagement with the housing wall. And the only description in the patent with respect to embodiments is for an engagement by the contact with the housing wall. So there's no evidence to support the fact that the housing wall is not necessary. It's made unnecessary by the theory that was used here. I guess I'm not sure I really understand what you're saying. We've got a function way result test here. Yes. And it seems to me maybe the question is the engagement. Okay, so you've got a tail end of the contact in engagement with the wall of the housing. And with respect to the infringing device, the argument with respect to way, which I guess is the hardest one to get through, is that the engagement is indirect. So there is engagement with the housing wall. It's just done in a different, not directly, it's done indirectly, which is essentially an equivalent way of doing it. So that's the theory, right? And just going back just to finish my question to add what Judge Newman pointed out is why wasn't the jury allowed, permitted, to do that kind of fact-finding and reach that conclusion? I'm sorry, I didn't mean to interrupt. The theory fails as a matter of law, it seems to me. And the reason for that is because by simultaneously saying the elastomer, which was defined as the means for biasing the contact for engagement into the housing wall, and making that equivalent to the housing wall. And recall that the district court, I think, correctly found that the patent required direct engagement. So indirect engagement was excluded from the claim construction, which is not challenged in this appeal. That by doing that, what the theory accomplishes is to erase a meaningful structural and functional limitation of the claim on which the public is entitled to rely on in avoiding infringement. Now, that's a direct citation from this court in, I think it's called Canopco. I've never heard it said out loud, so it's one of the cases we've cited several times over. Well, except our case law allows for the doctrine of equivalence. Absolutely. And that is defined as function way result. So why wasn't the jury entitled to accept the testimony of the witnesses that essentially, whether it's this elastomer or not, that it essentially operates in the same way, whether you're using this intervening force, which itself then rests on the outer housing. So it's less direct than what the patent explicitly claims. Because the function of the accused device was to encourage sliding. There is no testimony that rebuts the testimony from our witnesses at trial. And recall, I wasn't trial counsel. I wasn't at the trial. But there was no, in reading the testimony of the record, there's no testimony that is other than the design intention of the accused device was to encourage sliding. And the reason it encouraged sliding was to achieve a result of reducing what is called the wipe at the top and to avoid direct contact with the housing wall so that you the intention is with respect to the patent. Wasn't there a lot of evidence that it substantially decreases the amount of sliding? Right? I mean, there was a lot of testimony about that. And the district court concluded that the jury likely or almost obviously accepted that, that there was a substantial diminishment of the sliding in the accused device, right? There's a different, that's what the district court said. That was the testimony before the jury. There might have been contrary testimony. I don't recall at the moment. But in any event, why was the jury not allowed to credit that testimony and reach a conclusion that the accused device really does limit the amount of sliding? Let me split this up into pieces. Because although there's one question, I think there can, if I can use it that way, is different than the argument I'm making with respect to the elastomer being both the equivalent of the housing wall under their theory and the means for biasing. The infringement argument that was made was based not upon, there was no testimony from any of the witnesses that said, okay, I've looked at the claim, I've read what the claim construction is, and in my judgment for X, Y, Z reasons, it is in fact a substantial reduction of sliding. Rather, what was asked, and we've cited this in our main brief, I think it's very early on, page 17 or thereabouts, that there was an analysis that said, well, what would an reduction in sliding? And the testimony was, well, I looked at the prior art, and it was less than the prior art. And because it was less than the prior art, that substantially reduces sliding. Well, but if you have substantial reduction, you need to, and you want to talk about whether there's a substantial reduction or not, you need to know vis-a-vis what. What's the starting point? And isn't it reasonable to say, well, the substantial reduction is, or substantial elimination, I guess is the word used in the claim, is vis-a-vis what the prior art was. That seems to me at least a pretty good starting point, isn't it? I think it's a starting point, because you have to look at something. You have to understand what it was. But the testimony wasn't just that. It said, well, if it's less than 191, I think was the number. If it's less than 191, it's a substantial reduction. Well, it's considerably less than 191. I think it went down to 24 microns, right? Correct. But that's 24 times what the patented device, what the commercial embodiment of the patented device does. And I think it was misleading, in a sense, to talk about the width of a human hair and what this distance is, because we're talking about very small differences in terms of spacing. A micron, I'm told, of 60 microns is a human hair. Well, one micron to 24 microns, we're 24 times less reduction than what they have done. Well, it's interesting, because I think, based on what I could glean from the record, this is exactly the debate that the experts had before the jury. And what the district court judge said on Jamal is, yeah, you had a competing expert that tried to diminish the effectiveness of your numbers, gave some alternative numbers. But I don't think it's extreme for the district court then to have said, I have to defer. The jury was allowed to credit what one expert said. Even if we sit here, we're not a jury. Even if we agree with what you're telling us about these numbers, that's completely irrelevant to what we're doing here, right? No, I don't. The jury could credit one expert over another. Your expert complained about the way they were calculating this stuff. The jury heard all of that and reached a conclusion. This is classic, right? I don't think it is classic, because I'm not criticizing anybody's method. I'm not saying they're wrong about 24. It was really 73. I'm not here to say that, because that's not in the record, and that wasn't the argument before. My argument to Judge Bryson, essentially, is you can't say to the jury, well, it was substantially less, because it was less than the prior art. If that's the standard... Why not? Why isn't the prior art a pretty good... If you're talking about substantially reducing, it's reducing from something. So what would you pick if you wouldn't pick the prior art? What do you think is a better measure from reducing from what? Well, Your Honor, respectfully, you used the term starting point earlier. And I agree with you. You have to look at something. I think starting point... I'm not sure it isn't a pretty good stopping point, too. Because it's... What would be your reference point? Well, I'm certainly not a posita. I understand that. But presumably, you've given some thought in this case to what would have been the right thing for the... 95%. And I'll tell you why.  Because... 95% from 191. Presumably, yes. 87% that was shown in the evidence? Whatever the percentages were. But it would have to think at least 95% or close. And the reason I say that is because the district court found, I think correctly, that the intention of the patent was to reduce the sliding as much as possible. Okay, but you're still starting. When you say 95%, I take it you're still starting with the prior art, 191, right? I have no difficulty starting because, as Your Honor said before... No, it's going to be reduced from the 191. And the only question is how much is substantial, right? Correct. And you're saying as a matter of law, substantial has to have been 95% reduction? Well, I think it needs some reference. When you're talking about, there's lots of laws the court is obviously aware of when you have subjective standards of substantially this. And so you have to have some kind of reference. And perhaps the reference, at least as a starting point, is what the prior art said. That may be true. But it seems to me, and I'll go back to what I think is fundamentally the more important part of the argument, is that the literal infringement argument that converted itself into a doctrine of equivalence argument, I think, vitiates the need for the housing wall, which is, in fact, a meaningful structural and functional limitation. And how do we know that? Because the patent tells us that. I think it's column 3, lines 60 through 66 or thereabouts, that says that it was designed to have the contact make an engagement with the housing wall. It doesn't say housing wall or something else like it. It says with the housing wall to reduce sliding. I think I'm into my rebuttal time. Yes, you are. Okay. Why don't we hear from the other side and we'll restore some of that. Is this on? I think it's not. I'm going to clean up the podium from someone else. I didn't know what it was. Why don't you hand it to – is that just – I don't know what it is, but it wasn't mine. Thank you. May it please the court. JFM raises two issues on appeal. Both of those issues concern whether there is substantial evidence supporting the jury's verdict of infringement. Johnsteck raises a third purely legal issue concerning interpretation of the actual notice statute, section 287A. I'm going to start with whether Zigma uses an equivalent structure as the 866 patent. This is not a question of vitiation. This is a question of substantial evidence. The jury was presented first with expert testimony from engineer Mike Andres. Mr. Andres testified in Appendix 2795 to 2797 that the Zigma product uses a large rear elastomer of 70A shore, which is a hardness close to – I'm not sure. We've read your briefs. On this point, which is either function way result, the way piece of it, or the vitiation argument, either one, the district court – there's a claim construction on the word engagement, and the district court construed the term to require direct engagement between the contact and the housing wall. You did, yes. The argument would be under DOE and the vitiation doctrine, as we understand it, why isn't there a vitiation argument either with respect to the claim requires direct engagement, and there was no direct engagement here, given at best you could call it indirect engagement, and further, kind of an alternate argument, which is they require whatever engagement it is, it has to be with the housing wall, between the contact and the housing wall, and here there is no – in the equivalent doctrine, it can't vitiate that in a way that eliminates that entirely, because there's no contact here between the contact and the housing wall. So to me, that's the issue, and I think that's partly what your friend was arguing to us. Yes, and you framed it appropriately. And so the issue is why indirect engagement satisfies the doctrinal equivalence in this case. It's not a vitiation of the claim term. It's because the invention requires engagement to cause the contact to roll forward, and while the court did construe a claim construction required that there be direct engagement, that was because only direct engagement was shown in the patent, and it's a means-plus-function claim. We're proving equivalency not by showing disengagement or separation between the elastomer and the housing. We're showing that the elastomer, the rear elastomer, is an intermediary with the housing. So in effect, it is engaging the housing. The diagrams and depictions of the accused device left me feeling that I didn't have a real good idea of exactly how it functions and what it looks like. But in the accused device, there's the elastomer between the foot of the contact and the wall. Are there other elastomers in the same structure? There are, and that's an important distinction. And do they have the same composition as the elastomer that is between the wall and the foot, or are they softer or harder? I understand the elastomer between the foot and the wall is very hard, but are the others equally hard, or is the record clear on that? I think it was clear that both the elastomers in the Zigma product are made of the same composition of material, and it's important that the rear elastomer, however, is compressed and tightly placed within that housing, and it's confined within the housing and pre-compressed. Mike Andres testified to this. And that makes the rear elastomer stiffer and acts and functions like the housing wall. And that's what's also important is the judge's claim construction said that the structure required one or more elastomers. So it wasn't required to have two elastomers in order to practice the claim. And as you heard in the argument by my opponent, it has said that we're arguing that the same structure as another element is being used to prove equivalency. And that's not exactly correct because we don't have to – the claim can be satisfied by one elastomer. That rear elastomer could be considered. Now, I don't think it's inappropriate to use another element to show a separate structure. But here, that rear elastomer could be considered merely an intermediary and does not need to be considered the elastomer to prove the requirement of one or more elastomers because there are two elastomers in the device. So your argument really, I gather, is that it doesn't matter that it happens to be an elastomer that's between the wall and the foot of the contact. It could be a thin piece of metal that you've inserted in there so that it's in direct contact but it still functions exactly the same as if the foot were contacting the wall. That's your argument. I think that's precisely correct. And your opposing counsel would say, well, but the elastomer is perhaps hard but it's not so hard that it doesn't have some give to it. So it's not exactly the same as a wall that is solid, that's biasing with full force against the foot of the contact. They would argue otherwise, and they certainly have argued otherwise, but the jury heard that and they found to the contrary. And it's important to notice that in JFM's blue brief on page 25, they state something to the effect of this is not a polyurethane or a protracted coating, which they suggest would, as I understood it, would satisfy the doctrinal equivalence. So how much, whether you go from a thin coating of a polyurethane or some intermediary, that's a decision for the jury to evaluate based on the expert testimony that they heard on that function way result, competing testimony, and they decided in favor of Johnstic and it's based on substantial evidence. The evidence wasn't just based on the expert testimony. The other evidence was, of course, the patent by JFM. It says that the rear elastomer is used to protect the load board as well as their advertisement. JFM advertisement, trial exhibit 35, which advertises the counterforce in the Zigma to reduce load board wear. You've heard from the other side that, well, they've designed the product to encourage sliding. It's pretty clear from Warner Jenkins that, as it says, quote, that the intent plays no role in the application of the doctrinal equivalence. That's page 36. It doesn't matter what they intended. We disagree with their intent and we showed and contradicted them on cross-examination as to what their intent was. But it doesn't matter because their product also substantially eliminates sliding. Is there other, just as a touch, just sort of housekeeping, there are other issues remaining pending before the district court with regard to this case? No, there are not. There is fees or anything dealing with the judgment? No? The judge resolved all the issues and he denied an award of attorney's fees. He enhanced damages for 25% based on sales made after the verdict. He entered a permanent injunction. So it's all been resolved. Which leads us to the question of whether you get more. Correct, and I was going to transition to substantial elimination of sliding, but why don't we just move on to the issue of the cross-appeal and the issue of the actual notice. I find this meeting, of which there was some testimony, to be sort of befuddling.  The subject, or at least one principle, part of the subject of which, was this allegation of infringement, without anybody actually producing or referencing a particular patent. Apparently, at least so far as the record shows, that's true. That's what happened. We can't dispute that, Your Honor. The testimony... As bizarre as it seems, that seems to be the facts on the ground as we have them. Now, with that so, why isn't a case like SRI dispositive against you on this? SRI saying that, talking about the requirement of notice that requires the recipient be informed of the identity of the patent and the activity that is believed to be an infringement. I don't see that you are informed of the identity of the patent. So, the facts of SRI are different, because in that case, if my memory serves me, there was a letter that dealt... Yes, but this is the... I'm quoting from the section of the opinion in which the court states the standard to be applied in this setting. And there, the court is saying, a identity of the patent... It seems to me that it's as clear as could be that the identity of the patent was not disclosed in this case. The identity of the patent, we submit that we have not offered evidence that it was identified. So, why under SRI are you not done for? Because the statute doesn't require identification of the specific patent, and there was particular information identified in the meeting that's shown by the declaration of Mr. Adaran, who was submitted in opposition to summary judgment, that he explained that they believed the Zigma product, so they identified the accused product, and it violated, quote, Johnsteck's patent rights on the roll technology, and then they explained that Zigma's use of two elastomers and an S-shaped contact rolled across the load board. Okay, but Johnsteck has, I gather, 250-odd patents. Yes. So, if you go in and you say, you violated our patents, go fetch. Go look through our 250 patents and see if you can find one that infringes. That's not the purpose of the notice statute, is it, to put somebody to that kind of task? Well, I'm not clear. The purpose of the notice statute from the case law, it says that it's to protect innocent infringers who are unaware of a patent, but in the facts of this case... There's putatively innocent offenders, infringers, an opportunity to test the proposition that they infringe. In other words, if somebody comes in and says, you infringed, presumably the person is entitled to notice. It's sufficient to be able to say, oh, yeah, he's right. I do, or I don't think I do. But I don't see how, with a company that has 250 patents, coming in and saying, you infringe our patent rights. I don't see how that does that. Congress could have written a statute that allowed strict liability and didn't require notice if it wanted to. I believe that would be constitutional. In this case, it wrote the statute that it did, and it specifically said that the number, patent number, must be required and stated for marking, and it didn't state, with respect to actual notice, just as we've all seen it, proof that the infringer was notified of the infringement and continued to infringe thereafter. The question is construing notified of the infringement. I can just come up to you and say, you're infringing one of my four million patents, that that's really what was contemplated in this language. Don't you think it's a fair interpretation of this language to say notified of the infringement necessarily means that you identify the product and the patent claim which is being infringed? I submit that it's a fair reading. It's a fair reading that the activity of infringement has to be identified specifically, but it doesn't require the level of detail as the marking statute does for the specific patent number. And why would Congress do that? For exactly in a situation like this, where a company is using laypeople that don't know specifically what the specific issue is, but they provided the technology against a direct competitor who has knowledge of our product, who the day earlier has been his own... These are laypeople that don't have really any grasp of the patent and the claims and the things at issue. Then why is that a legit claim of infringement? We're assuming that if somebody makes a claim of infringement, it's a reasoned, knowledgeable claim. So those people need to have that to make the charge of infringement, right? They don't need to provide notice. The marking statute, for good reason, has to require a specific patent number because you're not having an active person there present. In a situation where you have a person telling you, you specifically and that product, infringe our technology related to our product, as the SECO district court has said, you don't need the level of detail. If they have additional problems with what information they've received, it could follow up. It could demand more details. But is your answer because they should be able to surmise what patent claims you mean? Or is it because that is irrelevant? Well, how can they assess whether or not they agree or disagree or whatever, unless they know what you're accusing them of? I don't know. So are you saying that knowledge is irrelevant? Are you saying that it's their burden to go and search it out? I'm saying as long as you provide information about the activity that's the alleged infringement and you provide a level of detail, some level of detail that complies with the statute. Well, some level of detail. What we're struggling with is what do you mean by that? Well, the patent, the statute. Suppose, I can imagine a case in which somebody doesn't actually give the number of the patent but identifies the patent with sufficient specificity that it satisfies the requirement of notice. For example, if you say the name of the patent is X. It is my only patent. You can find it easily. Just go on to Google patents and you'll find it by the name. That's probably sufficient. I don't know that actually having the 9,856,251 is required. But to say, particularly, again, a company that has 250 patents, to say you infringe one of our patents but we're not going to tell you what it is, is that notice? It doesn't sound like notice to me. Well, the record didn't quite put it to that degree. No, but I extracted the 250 from the record and I extract from the record also, as you agreed, that they didn't identify the patent. So that kind of leaves us where I left off, doesn't it? No, I think what it leaves us is as long as there's been a level of detail shown that is, quote, notified of the infringement and the level of detail here, that it satisfies the statute because it provided them some details about the technology at issue so that they could provide... What's the definition of infringement? Does it include that you're infringing something and there's something that's being infringed? Well, I mean, we've quoted the dictionary definition from the Black Law Dictionary. It's the act of the infringer, their transgressions or trespasses on our intellectual property. On your claim, right. Correct. Right, that's part and parcel of it, that they are transgressing what you have claimed to have gotten exclusive rights to you. Right. I don't think it... The statute doesn't put it to that level of precision like it does for the marching statute. Okay. I think I've run out of time. We have restored two minutes. Thank you very much, Robert. There's one additional point. SRI, I think, is the end of the story. But at appendix 426 through 428, you will see the testimony that we asked for the number and they refused. And it seems remarkable to me that actual notice is, under their theory, less specific than the constructive notice that marking would have provided. Had they marked, they could have withheld any patent numbers they wanted in a meeting. I think it's a closed question. The district court resolved it correctly. Let's go back to what I think is the principal argument for why the jury verdict here should be reversed. And that is with respect to the vitiation. Let me get your reaction to the question that I asked you, opposing counsel. Suppose what the accused device had done is instead of the elastomer, had put a very thin piece of metal between the foot of the contact and the back wall. Would you agree that that would be a permissible doctrine of equivalence? Where the contact touches that thin piece of metal? Yes, right. The contact touches the thin piece of metal and the thin piece of metal is in direct contact with the back wall. My immediate reaction is, if that isn't an insubstantial addition for avoiding infringement, exactly the reason that the doctrine of equivalence was created by whatever court it was, whenever it was a thousand years ago, then there isn't anyone. Because that was my example about doing polyurethane. Everything in this patent, including the figure... Wait, just so I'm clear. So you're agreeing that that would come under DOE? I believe it would, yes. That's why I did the qualification. I think Judge Bryson agreed with this, that it's the contact that's touching the metal strip that's in front of the... What's the difference? Why is this case different? This case is different because, first, the patent figure shows direct engagement. I guess it's this way. The patent figure shows direct engagement of the contact with the housing. But that wouldn't be true in the example with the piece of metal. Correct, but the piece of metal, I'm presuming, and it seems sensible, that the only reason it's put there is to avoid direct engagement with... Protect the back wall from where? I'm sure if I were retained to defend them, I'd come up with better reasons even than that. Probably you would. But in this argument today, I will say to you, I would find it a very difficult argument. And I would say to my client, I think we have to settle this case because that's not going to work. But in this case, it's a very substantial difference. And the difference is seen if I may cite you to... The invention in this patent, this is Appendix 27. It's Column 3, beginning at Line 55. This contactor system has been designed to prevent contact, translational relative motion, paren, sliding, close paren, against the load board 28. Sliding motion causes wear and tear on the load board pads, an undesirable characteristic. The sloped terminus of Contact Tail 6 in engagement with Housing Wall 15 is instrumental in preventing the Contact 18 from sliding along the load board. The front elastomer also plays a role in helping achieve this and by forcing the Contact 18 in a direction to remain seated against the wall of the Housing 10. Now the elastomer in the Zygma device is the means, excuse me, in the patent, is the means for biasing the contact to the engagement with the Housing Wall. In the analysis of the accused Zygma device under their doctrine of equivalence, they are eliminating the need for the Housing Wall, which is a specifically called out separate element. Because they say, well, and Mr. Courtland, Mr. Merrill here earlier said, it engages the Housing Wall because it touches through the elastomer. So the elastomer becomes both the means for biasing and the equivalent of the Housing Wall, making the need for the required element of the Housing Wall unnecessary. It vitiates that requirement. For those reasons, I ask that the judgment below be reversed and remanded for the entry of judgment for JFM. Thank you very much for your time and attention. We thank both sides and the case is submitted.